**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Newport News Division

DELLA G.,[1]

                Plaintiff,

v.                                  ACTION NO. 4:20cv124

ANDREW M. SAUL,
Commissioner of Social Security,

                Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Della G. ("plaintiff") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 14. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment (ECF No. 16) be **GRANTED**, and the Commissioner's motion for summary judgment (ECF No. 18) be **DENIED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. COMM. ON CT. ADMIN. & CASE MGMT. JUD. CONF. U.S., PRIVACY CONCERN REGARDING SOCIAL SECURITY AND IMMIGRATION OPINIONS 3 (2018).

# I.   PROCEDURAL BACKGROUND

Plaintiff's claim stems from her April 24, 2017 protective filing and later application for SSI, alleging disability beginning May 1, 2015, due to a major depressive disorder, generalized anxiety disorder, attention deficit hyperactivity disorder ("ADHD"), neuropathy, high blood pressure, migraines, eczema, lymphotrophy, diverticulosis, fatigue, and sciatica.[2] R. 108–09, 184–91. Plaintiff, through counsel, later amended the onset date of disability to April 24, 2017.[3] R. 36; *see* 20 C.F.R. § 416.202 (explaining a claimant is ineligible for SSI before filing an application for such benefits).

After denial of the claim both initially and on reconsideration, plaintiff requested a hearing before an administrative law judge ("ALJ"). R. 108–37, 159–60. ALJ Jarrod Tranguch heard the matter on August 29, 2019, and issued a decision denying benefits on October 30, 2019. R. 15–25, 30–72. On July 29, 2020, the Appeals Council denied plaintiff's request for review of the ALJ's decision. R. 1–5. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 416.1481.

Plaintiff filed a complaint on August 3, 2020. ECF No. 1. The Commissioner answered on February 22, 2021. ECF No. 12. The parties filed motions for summary judgment, with supporting memoranda, on March 23 and April 22, 2021, respectively. ECF Nos. 16–19. Plaintiff filed a reply brief on May 6, 2021. ECF No. 20. As oral argument is unnecessary, the case is deemed submitted for a decision.

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

[3] At the hearing, and before the Court, plaintiff has been represented by Robert W. Gillikin, II, Esquire. R. 30, 32; ECF No. 1, at 2.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   *Background Information and Hearing Testimony by Plaintiff*

At the time she testified before the ALJ on August 29, 2019, plaintiff was 47-years-old and a married, but separated, mother of two children, the younger of whom lives with her mother. R. 37–38, 185. Plaintiff graduated high school and completed two years of college. R. 39. She last worked in 2009, as a retail clerk in a jewelry store. R. 40–41, 212.

Plaintiff testified that she stopped working primarily due to depression and anxiety, and neuropathy in her hands, feet, and back. R. 44. With respect to physical ailments, plaintiff testified to having shoulder pain, right-sided sciatica running from her spine and down her leg, numbness and tingling in her hands, and neuropathy in her hands and feet (along with associated fatigue). R. 44–45, 51; *see also* R. 50 (complaining of chest pain associated with high blood pressure, but also stating that medication lowered her pressure and reduced her chest pain). These conditions make it difficult for plaintiff to sit for more than 15–20 minutes, lift items weighing more than 5–10 pounds, and walk more than a block without rest breaks. R. 44–45.

With respect to mental health, plaintiff stated her problems with depression began as a child, escalated following surgery in 2010, and that she often feels depressed and anxious. R. 56; R. 59 (discussing "surgical menopause" and stating "they said I always had ADHD, [b]ut it didn't come out till after all that"); R. 378. As a result, plaintiff naps during the day and has problems with focus, concentration, short-term memory, and being unable to find things. R. 56–57. To treat these issues, plaintiff takes medication and received some counseling a year or two before the hearing. R. 54–55. Although reporting that medications "help[ed] some," plaintiff avoids driving after taking them due to drowsiness. R. 57.

3

On a typical day during the school year, plaintiff gets her daughter up and ready for school, packs a lunch, and puts her on the bus outside plaintiff's home. R. 57–58. Afterwards, plaintiff sleeps for several hours and then does light household chores, such as laundry and dish washing, until she returns to napping due to medication-induced drowsiness. R. 58–59. Although she still "do[es] everything," plaintiff said that completing chores may take several days, during periods of "bad days," unlike in times past when she promptly performed such tasks. *Id.* She also reported trying to get more done on "good days," including driving to the store to buy groceries and sometimes going shopping with her sister. R. 58–60. When her daughter returns from school, plaintiff greets and feeds her a snack and gets her started on homework. R. 58. Plaintiff remains able to engage in personal care tasks, such as bathing, dressing, and feeding herself. R. 59.

Plaintiff's October 8, 2017 function report contains similar information. R. 222–29. She reported driving, going grocery shopping twice a week, preparing meals, needing no help or reminders for taking medications, and that her kids help with household chores, including laundry. R. 224–25. While able to pay bills and count change, plaintiff indicated that she cannot handle a bank account and has "no interest" in doing so. R. 225–26. Plaintiff listed no hobbies and said that due to her condition she "do[es] not want to do anything." R. 226. Her condition also impacts her abilities to concentrate and get along with others. R. 227. As to the former, plaintiff reported that ADHD interferes with maintaining attention and following a cooking recipe, and necessitates the repetition of instructions. *Id.* As for social interactions, plaintiff distrusts others, avoids family gatherings, avoids dealing with authority figures, and does not handle stress or changes in routine well. R. 227–28. Finally, plaintiff reported a restricted ability to walk, typically for ten minutes, followed by five minute rest breaks. R. 227.

4

**B.**   *Hearing Testimony by Vocational Expert*

Dana Marmo, a vocational expert ("VE"), also testified at the hearing. R. 62–70, 270–72. She identified plaintiff's past relevant work as a jewelry salesperson. R. 63. Based on the ALJ's hypotheticals, VE Marmo opined that past relevant work could not be performed. R. 63–64. In response to the ALJ's first hypothetical,[4] VE Marmo opined that such a person could work as a tagger, night cleaner, and garment sorter and that many thousands of such jobs were available nationally. R. 62–63. In response to the ALJ's second hypothetical,[5] VE Marmo opined that such a person could work as a video monitor, document preparer, and final assembler, and that many thousands of such jobs were available nationally. R. 64–65. In response to the ALJ's third hypothetical,[6] VE Marmo opined that no work was available. R. 65.

Plaintiff's counsel then questioned the VE, who agreed that limiting the first hypothetical to a person with a lifting capacity of 10 pounds "preclude[d] all light labor." R. 66. Based upon counsel's representation, the VE also agreed that the Selected Characteristics of Occupations

---

[4] The first hypothetical assumed a person of the same age, education, and work experience as plaintiff and limited such a person to: (1) jobs at the light exertional level; (2) only occasional stooping, crouching, crawling, stair climbing, and use of ramps; (3) avoiding climbing ladders, ropes, and scaffolding; (4) occasional exposure to wet/slippery conditions and irritants to breathing; (5) avoiding workplace hazards, such as unprotected heights and dangerous machines; (6) jobs that can be learned with one month (or less) of training; (7) low stress jobs, involving only occasional, simple decision-making, and only occasional changes in duties and setting; (8) jobs involving only occasional interaction with co-workers, and no more than rare or incidental contact with others. R. 63–64.

[5] For the second hypothetical, the ALJ also limited such a person to: (1) sedentary work; (2) jobs involving lifting no more than 10 pounds; and (3) jobs involving standing and/or walking limited to more than two hours in an eight-hour workday. R. 64.

[6] For the third hypothetical, the ALJ further limited such a person to: (1) jobs with unscheduled breaks, where the person would generally be off task 20% or more of the workday; and (2) jobs where the person would be late, absent, or need to leave early at least two days a month, without prior notice. R. 65.

indicated that work as a video monitor required "frequent talking." R. 66–67. In response to counsel and the ALJ's questions about the availability of jobs as a document preparer, the VE indicated that she used the number corresponding to the job category, rather than the specific DOT code (relating to preparing documents for microfilm/microfiche), because the job still exists and can be performed in multiple settings at the present time, even if use of microfilm and microfiche has decreased in recent years. R. 67–70. Finally, the VE indicated that her opinions were consistent with information contained in the Dictionary of Occupational Titles. R. 70.

## C.   *Relevant Medical Record*

### 1.   *Treatment with Dr. William Franklin, Jr.*

The record reflects that William Franklin, Jr., M.D., served as plaintiff's primary care physician from roughly March 2016 through May 2019. R. 619, 627, 751, 764. Consistent with plaintiff's amended onset date of April 24, 2017, the Court focuses primarily on treatment received on or after that date. R. 36. During 2016, Dr. Franklin treated plaintiff for various conditions including hypertension, neuropathy, migraine headaches, right-sided sciatica, and pain in her neck, shoulders, and back, and referred her to other treatment providers, including an infectious disease specialist, gynecologist, neurologist, and psychologist. R. 744, 746, 748, 750–52.

During 2017, plaintiff had approximately eight office visits with Dr. Franklin. R. 675, 677–81, 684, 687, 735. On March 21, 2017, shortly before the amended onset date, plaintiff's chronic, active diagnoses included: diverticulosis of intestine; asymptomatic human immunodeficiency virus ("HIV"); right-sided sciatica; hypertension; dermatitis; polyneuropathy; ovarian failure; migraine, unspecified, not intractable, without status migrainosus; and major depressive disorder. R. 735; *see also* R. 684 (listing also ADHD and prescribing Adderall). Although not entirely clear, it appears that Dr. Franklin continued these diagnoses through the

6

2017, 2018, and 2019 treatment notes discussed below. *See, e.g.,* R. 489–90, 630, 644.

During January, March, May, June, July, September, October, and December 2017, treatment notes reflect plaintiff typically saw Dr. Franklin on follow-up visits for hypertension. R. 675, 677–81, 684, 687. The notes indicate that plaintiff typically reported she was "doing well," had "no concerns," and had no complaints about headaches or chest pain. *Id.*; *see also* R. 677 (noting "only concern is . . . neuropathy"); R. 681 (noting "[n]o complaints of foot numbness or paresthesias"); R. 684 (same). The notes also reflect that Dr. Franklin objectively assessed plaintiff's general condition, neck, chest, heart, abdomen, and extremities and typically found them to be normal and unremarkable. R. 675, 677–81, 684, 687. Dr. Franklin's notes also regularly list plaintiff's hypertension as controlled with medication. *Id.*

During 2017, Dr. Franklin occasionally assessed plaintiff for other problems. Unfortunately, his notes contain few details. Following a referral for psychological testing discussed below, on March 21, 2017, Dr. Franklin diagnosed ADHD and prescribed a daily, morning dose of 10 mg. of Adderall. R. 684. On July 27, 2017, Dr. Franklin also diagnosed "[m]igraine, unspecified, not intractable, without status migrainosus," but also noted "[n]o complaints of headache, chest pain." R. 679. Notes from September 25, 2017, report a diagnosis of "[p]olyneuropathy" and plaintiff's request for referral to "another neurologist." R. 678. The treatment plan included referrals to a psychologist "for increased depression" and to someone other than Sentara Neurology for neuropathy in upper and lower extremities.[7] *Id.* On October 2, 2017,

---

[7] On October 24, 2017, plaintiff treated with a social worker at Gordon Wellness, LLC, on referral from Dr. Franklin for medication to treat anxiety and depression. R. 717. During the session, plaintiff reported being "unemployed due to . . . anxiety and depression symptoms." R. 718. A mental status exam found plaintiff to be, among other things: attentive, with good eye contact; well groomed; calm, cooperative, and friendly but worried; exhibiting no signs of psychomotor agitation; with normal, coherent, and fluent speech; with normal though process and content; and with normal judgment. *Id.* The therapist assessed plaintiff as presenting with anxiety and

Dr. Franklin discontinued plaintiff's prescription for clonidine and increased her dosage of Norvasc, apparently for hypertension.[8] R. 677.

In a November 7, 2017 medical source statement, Dr. Franklin indicated by means of check marks that plaintiff: (1) exhibited lower back pain, joint pain, fatigue or malaise, muscle spasms, neuropathy, severe headaches, depression, and anxiety; (2) could "never" lift and carry less than 10 pounds on a regular basis; (3) could only sit for less than two hours and only stand/walk for less than two hours during an eight-hour workday; and (4) would miss "4+ days/month" due to her pain and medical problems, if offered full-time employment. R. 489; *see also* R. 490 (attaching a list of chronic, active diagnoses).

During 2018, plaintiff had approximately four office check-ups with Dr. Franklin in February, May, August, and October, and on each occasion was continued on current medications.[9] R. 638–48. Other than noting that plaintiff received treatment from a specialist for neuropathy and that her depression was being effectively managed with medication, reviews of plaintiff's body systems during these visits reported mostly unremarkable findings. R. 638, 640, 643–44, 647. Dr. Franklin's objective assessments of plaintiff's condition were also unremarkable, and noted,

---

depression (major, recurrent), with severe stress, and multiple health, occupational, relationship, and social environment problems. R. 718–19. Although the therapist referred plaintiff to "[p]sychiatry," there are no records of further treatment at Gordon Wellness. R. 719; *see* R. 716 (referring plaintiff back to Dr. Franklin for medication).

[8] Dr. Franklin also referred plaintiff to Riverside Cardiology Specialists, who evaluated plaintiff on December 11, 2017, for hypertension and any potential heart issues. R. 495–98, 511. The examination by a nurse practitioner, as well as the results of an echocardiogram, ruled out any issues, and led to a recommendation to take clonidine at bedtime, to minimize blood pressure fluctuations and low morning readings. R. 495, 498.

[9] In a July 26, 2018 disability report, plaintiff reported currently taking the following medications: acetaminophen; Adderall; Amlodipine; Amrix; besylate; Butalbital Codeine; Chlorthalidone; Losartan; metoprolol; and Zoloft. R. 245.

among other things, normal blood pressure, normal neurologic state, and the absence of sciatic pain. R. 638–41, 643–44, 646–47.

In 2019, prior to the ALJ hearing, Dr. Franklin saw plaintiff once in April and twice in May for check-ups or a physical. R. 627–33. The review of systems discussed above and Dr. Franklin's objective assessments of plaintiff's status remained essentially the same as reported in 2018. *Id.*

### 2. *Genesis Counseling Center – Dr. Cynthia Kokoris*

Cynthia Kokoris, Psy.D., conducted a psychological evaluation of plaintiff on February 27, 2017, on referral from Dr. Franklin. R. 277–82, 736–37. During intake, plaintiff identified concerns as including her "scattered and nervous" emotional state, anxiety, life stressors, an inability to complete tasks, and medical problems including HIV and neuropathy in her hands and feet. R. 278 (noting treating physician's management of depression with Zoloft, "that she takes on and off" but not currently, and reported prior use of Ativan). Testing designed to assess plaintiff's processing speed and working memory abilities found the former to be "within the [b]orderline range" and the latter to be "within the [l]ow [a]verage range." *Id.* (noting that "[l]ower scores . . . are often indicators of attentional concerns"); R. 282. Testing designed to identify ADHD symptoms led to results indicative of "clinical level concerns with inattention and her abilities to sustain attention." R. 278. Testing to assess the functioning of plaintiff's personality "indicate[d] she experiences significant difficulties with concentration, has memory difficulties, and experiences a low frustration tolerance and impulsivity," but Dr. Kokoris cautioned that plaintiff "may have over-reported on her cognitive and somatic symptoms." R. 277–78, 281.

Based upon the testing, plaintiff's self-report, and an interview, Dr. Kokoris diagnosed plaintiff with ADHD, combined presentation, moderate, generalized anxiety disorder, and major depressive disorder, recurrent episode, moderate. R. 278–79. Dr. Kokoris recommended

9

individual therapy and recommended that plaintiff undergo a medication consultation. R. 279–80.

### 3.   *Treatment at Mary Immaculate Hospital*

On March 22, 2017, plaintiff received treatment at the emergency room at Mary Immaculate Hospital for chest tightness and pain, radiating to her upper back. R. 285. A physical exam, a chest x-ray, and an EKG led to mostly normal results and plaintiff was assessed to be at a low risk of a major adverse cardiac event. R. 286–92 (noting findings of lymphadenopathy, "[c]hronic right-sided low back pain with right-sided sciatica," prescribing Toradol, and directing follow-up with neurologist and infectious disease physician); *see* R. 381–86 (noting similar encounter at Sentara Careplex emergency department on February 25, 2016).

### 4.   *Treatment at Sentara Health*

Plaintiff also received treatment from Sentara Health personnel dating back to at least 2015. *See, e.g.*, R. 447. On referral from Dr. Franklin, Dr. Maria Guina with Sentara Neurology Specialists treated plaintiff on May 11, July 28, and September 15, 2016, primarily for complaints of neuropathy and migraine headaches. R. 371, 375–77. On May 11, 2016, plaintiff complained of constant, sharp, and throbbing "all over body pain," increasingly severe migraine headaches, insomnia, and paresthesias and associated numbness in her fingers and feet. R. 377–78. A review of systems was positive for photophobia, nausea and vomiting, and joint pain; but negative for, among other things, depression and anxiety. R. 379. A mental status exam found plaintiff properly oriented in all spheres, with 3/3 immediate and recent recall, and with attention, concentration, calculation, and 3 step commands all "preserved." *Id.*; *see also* R. 374 (noting same mental status findings on September 15, 2016 and plaintiff's report of anxiety, but not depression).

Treatment notes indicate that Dr. Guina initially prescribed amitriptyline, topiramate, and Vitamin D, but later stopped the amitriptyline (due to plaintiff's reported fatigue and drowsiness)

and substituted gabapentin for topiramate. R. 371, 375, 477–78. Dr. Guina assessed plaintiff with "[i]ntractable chronic migraine without aura and with status migrainosus" and "[p]eripheral neuropathy, idiopathic." R. 371–72. An MRI of plaintiff's head conducted on July 26, 2016, found "[n]o evidence of acute intracranial process." R. 413–14.

On April 18, 2017, plaintiff's right hip, left elbow, and right knee were x-rayed, shortly after a reported fall. R. 411–13. Aside from mild degenerative changes of the sacroiliac joints and "trace right knee joint effusion," the x-rays were otherwise normal. *Id.* Similarly, x-rays taken on May 17, 2017, and August 13 and August 15, 2018, of plaintiff's chest and lower left leg led to no remarkable findings. R. 610, 612, 615, 619.

On May 26, 2018, plaintiff reported to the emergency department at Sentara Port Warwick Hospital, on the direction of a "social security disability doctor" who took a blood pressure reading of 178/130. R. 515. Although complaining of a mild headache, plaintiff denied any recent illness, chest pain, dyspnea, leg swelling, extremity numbness or weakness, or other complaints. *Id.*; *cf.* R. 523 (reporting head pain of 8 out of 10). A physical examination found no abnormalities and included findings that plaintiff: (1) exhibited a full range of motion in all extremities, and without evidence of peripheral edema or muscular tenderness or back tenderness; (2) was alert, awake, and properly oriented, with equal strength (5/5) in her upper and lower extremities bilaterally; and (3) showed no sensory or acute focal neurological deficits. R. 518; *see also* R. 523 (noting plaintiff's peripheral neurovascular and neuro cognitive status were within defined limits). Shortly before being discharged and told to follow-up with Dr. Franklin for hypertension, plaintiff's blood pressure reading was 126/82. R. 520, 543.

**5.**     *Consultative Psychological Examination – Howard Bierenbaum, Ph.D.*

On September 27, 2017, Dr. Howard Bierenbaum conducted a psychological, consultative examination. R. 481. Plaintiff, who drove herself to the appointment, presented as cooperative, "reserved but responsive," and with a stooped posture and steady gait. *Id.* Plaintiff recounted her work and educational history, as well as a troubled family history, involving sexual abuse. R. 482.

As for medical history, plaintiff reported pursuing treatment for mental health, but not HIV. *Id.* Under Dr. Franklin's care, plaintiff reported taking Zoloft and Adderall, with "some benefit," and previously taking Ativan. *Id.* She reported continuing problems with depression, anxiety, impulsivity, inattention, and social withdrawal. R. 482–83. Plaintiff also reported struggling with chronic fatigue, neuropathy in her extremities, high blood pressure, migraine headaches, HIV, ADHD, eczema, diverticulitis, and sciatica. R. 481.

In assessing mental status, Dr. Bierenbaum noted plaintiff needed encouragement to persist in completing challenging tasks. R. 483. He observed that she: (1) "displayed a range of affective expression, demonstrating in particular anxiety and dysthymia"; (2) tended towards "concrete" thinking, but was "mostly goal directed"; (3) was alert and properly oriented, without attention or focus problems; and (4) exhibited grossly intact insight and judgment. *Id.* On the Folstein Mini-Mental Status exam plaintiff scored in the normal range, "suggesting no gross difficulties with orientation, cognition, or memory," and exhibited "low average" intellectual functioning, with memory function corresponding thereto. *Id.*

Dr. Bierenbaum diagnosed:  (1) major depressive disorder, recurrent, severe; (2) unspecified anxiety disorder; (3) ADHD; (4) PTSD; (5) HIV; and (6) "multiple medical complaints." *Id.* He characterized plaintiff's prognosis as "fair." R. 484. As to plaintiff's functional abilities, Dr. Bierenbaum opined:

12

> The claimant might be able to perform simple and repetitive tasks with support, . . . although her medical disorders and emotional difficulties might place some limitations on her ability to respond to the demands of the work day. She likely would be able to perform simple and repetitive tasks with direction and supervision, although she could find dealing with the public in a work setting to be challenging, related to her medical disorders and emotional difficulties. Thus, she might have moderate difficulty successfully completing a normal work day or work week and interacting with co-workers and the public, because of the problems cited above.

*Id.*

### 6. *Consultative Physical Examination – Christopher Beal, D.O.*

On May 26, 2018, plaintiff underwent a consultative physical examination with Dr. Christopher Beal and advised him that hypertension and ADHD prevented her from working. R. 485. Plaintiff reported having high blood pressure for a couple of years and having difficulty controlling the condition.[10] R. 485–86. She attributed periodic headaches, dizziness, and fatigue to her condition. R. 486. She also complained about symptoms of ADHD and surgical menopause. *Id.* Dr. Beal's review of plaintiff's systems was negative, except for the conditions noted above. *Id.* His physical examination noted plaintiff was moderately distressed and very tearful, but she demonstrated good effort and remained able to get off and on the exam table without assistance. R. 487.

As for mental status, Dr. Beal found plaintiff fully alert and properly oriented, able to speak and be understood, but prone to conversational tangents and needing regular redirection. *Id.* In assessing memory, Dr. Beal indicated plaintiff scored 3/3 in immediate recall, 1/3 after the passage of five minutes, and 1/3 with simple cues. *Id.* Plaintiff could name assorted presidents, recite the days of the week backwards, and spell world forwards and backwards, with some self-correction. *Id.* Plaintiff erred in assessing a basic math problem. *Id.*

---

[10] Due to a high blood pressure reading (179/130), Dr. Beal directed plaintiff to immediately go to the emergency room after the exam for evaluation of risk of stroke or heart attack. R. 486.

Dr. Beal's neurologic examination revealed plaintiff had a narrow reciprocal gait and walked quickly, could tandem gait, walk on her heels and toes, all without any assistive devices. *Id.* Plaintiff exhibited equal grip strength, grossly intact sensation, and normal reflexes and 5/5 strength in her upper/lower extremities. *Id.*

Dr. Beal diagnosed hypertension and ADHD, and noted that plaintiff was "very tangential," seems to have "issues with focusing," and "[h]ad some difficulty with immediate recall after 5 minutes." *Id.* Based on the foregoing, Dr. Beal opined that plaintiff: (1) had no restrictions on the numbers of hours she could stand, walk, or sit during an eight-hour workday; (2) could carry and lift 50 pounds occasionally and 20 pounds frequently; and (3) had no manipulative, postural, visual, or communication limitations. R. 488.

### 7.   *Opinions of State Agency Physicians*

On October 10, 2017, state agency consultant Andrew Bockner, M.D., concluded on initial review that, although plaintiff had severe mental impairments, she could perform competitive work, with appropriate mental limitations. R. 118. Dr. Bockner rated plaintiff's: (1) understanding and memory as ranging from not significantly to moderately limited; (2) concentration and persistence ranging from not significantly to moderately limited; (3) social interactions as ranging from not significantly to moderately limited; and (4) ability to adapt as without limitations. R. 117–18; *see* R. 113 (noting moderate limitations in concentration, persistence, and maintaining pace). On June 5, 2018, state agency psychologist Howard Leizer, Ph.D., reached the same conclusions. R. 133–34; *see* R. 129 (noting moderate limitations in concentration, persistence, and maintaining pace).

On July 10, 2017, Roger Tims, M.D., opined on initial review that plaintiff: (1) could lift or carry up to 20 pounds occasionally, and up to 10 pounds frequently; (2) could stand or walk or

14

sit for about 6 hours in an 8-hour workday, with normal breaks; (3) could push or pull without limitation, aside from the noted weight limitations; (4) could occasionally climb, stoop, and crouch; (5) could frequently balance, kneel, and crawl; and (6) had no manipulative, visual, communicative, or environmental limitations. R. 115–16. On reconsideration, Eugene Noland, M.D., made similar findings, but opined plaintiff could only lift or carry 10 pounds occasionally, and less than 10 pounds frequently. R. 131–32. Dr. Noland also assessed plaintiff's postural limitations to allow: (1) frequent climbing of ramps/stairs and only occasional climbing of ladders, ropes, and scaffolds; and (2) unlimited balancing, stooping, kneeling, crouching, and crawling. R. 132.

### III.  THE ALJ's DECISION

To evaluate plaintiff's claim of disability, the ALJ followed the sequential five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. § 416.920(a). Specifically, the ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents performance of any past relevant work in light of his residual functional capacity; and (5) had an impairment that prevents engaging in any substantial gainful employment. R. 16–25.

First, the ALJ determined that plaintiff had not engaged in substantial gainful activity as of the amended onset date of disability, April 24, 2017. R. 17.

At steps two and three, the ALJ found that plaintiff's major depressive disorder, generalized anxiety disorder, ADHD, and neuropathy constituted severe impairments. R. 17–18 (also noting plaintiff's body mass index, that her hypertension was controlled with medication, HIV was asymptomatic, and diverticulosis was mild, and finding such conditions to be non-

15

severe).   The ALJ further determined that plaintiff's severe impairments, either singly or in

combination, failed to meet or medically equal the severity of one of the impairments listed in 20

C.F.R. Pt. 404, Subpt. P, App'x 1, as required for a finding of disability at step three.  R. 18–20.

The ALJ next found that plaintiff possessed the residual functional capacity ("RFC"):

> to perform light work . . . except she could occasionally stoop, crouch, crawl, use
> ramps and climb stairs but never climb ladders, ropes or scaffolds.  The claimant is
> limited to occasional exposure to [certain work environments and conditions and]
> must avoid workplace hazards . . . . She could perform jobs . . . which are generally
> classified as unskilled.  The claimant could perform jobs that would be considered
> "low stress" that would involve only occasional simple decision-making and only
> occasional changes in work duties or work setting.   The claimant could have
> occasional interaction with co-workers and rare or incidental contact with
> customers/public.

R. 20.[11]

Although finding that plaintiff's impairments could be reasonably expected to cause some

of her alleged symptoms, the ALJ found her statements about their intensity, persistence, and

limiting effects were not entirely consistent with the medical and other evidence of record, and her

activities of daily living.  R. 21, 24.  Specifically, the ALJ found that, notwithstanding plaintiff's

neuropathy, examinations showed that plaintiff retained full strength in her upper and lower

extremities, as well as normal muscle tone and bulk and normal reflexes.  R. 21.  The ALJ found

Dr. Franklin's assessment of plaintiff's physical limitations to be unpersuasive, due to its

inconsistency with any specific examination findings and the fact that his regular physical

examinations of plaintiff "tend[ed] to be essentially normal."  R. 23.  Instead, the ALJ found the

state agency medical consultants' opinions that plaintiff's limitations supported the performance

---

[11] The RFC specified "jobs that would take no more than one month of training to learn with a
specific vocational preparation (SVP) level of two or less."   R. 20.   An SVP level of two
corresponds to unskilled work.  *See* Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704, at
*3 (Dec. 4, 2000) ("Using the skill level definitions in 20 C.F.R. 404.1568 and 416.968, unskilled
work corresponds to an SVP of 1-2.").

of light work activity as more persuasive and consistent with plaintiff's "rather benign examination findings." *Id.* (noting the absence of objective evidence supporting specific functional limitations, but that the consultants' opinions assessed some impairment based upon plaintiff's "self-reported limitations and subjective complaints"). Finally, the ALJ found Dr. Beal's opinions to be only partially persuasive, particularly as to plaintiff's lifting and carrying abilities, as he treated plaintiff only once and could not have accounted for the complaints she later testified to at the hearing. *Id.*

On the psychological front, the ALJ found the opinions of the state agency consultants "generally persuasive," based on their partial consistency with plaintiff's mental health treatment records and examination findings. *Id.* The ALJ, however, found plaintiff more limited in her ability to adapt and manage herself, based on her own reporting and her tearful and unfocused presentation when seen by Dr. Beal. R. 23, 487.

At step four, the ALJ found that plaintiff's existing RFC precluded her return to past relevant work. R. 24. Based in part upon the VE's testimony, however, the ALJ found that other jobs existed in significant numbers nationally that plaintiff could have performed. R. 25.

Accordingly, the ALJ concluded plaintiff was not under a disability for the pertinent period and was ineligible to receive SSI. *Id.*

## IV.    STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589 (citing *Hays*, 907 F.2d at 1456). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman*, 829 F.2d at 517.

## V.     ANALYSIS

***The ALJ failed to appropriately account for plaintiff's moderate limitations in her ability to concentrate, persist, and maintain pace or explain why plaintiff remained able to work in spite of such deficits.***

Plaintiff argues that a remand is required because the ALJ's RFC assessment fails to address limitations stemming from her inability to concentrate, persist, and maintain pace while working. Pl.'s Br. in Supp. Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 17, at 5–12 (citing *Mascio*

18

*v. Colvin*, 780 F.3d 632 (4th Cir. 2015)). Plaintiff argues that none of the mental-health related limitations in the RFC addresses her ability to sustain work on a daily and weekly basis, as required by *Mascio*. Pl.'s Mem. at 6–7. In addition to failing to specify explicit limitations directed to such issues, plaintiff argues that the ALJ failed to use other "descriptors" and restrictions that may be suitable proxies for such limitations. *Id.* at 7–8 (citing *Sizemore v. Berryhill*, 878 F.3d 72 (4th Cir. 2017)). Finally, plaintiff argues that, in the absence of express limitations or other restrictions implicitly addressing a claimant's ability to sustain work, the ALJ was required but failed to explain why such limitations were unnecessary. *Id.* at 9 (citing *Shinaberry v. Saul*, 952 F.3d 113 (4th Cir. 2020)). Based on the foregoing, plaintiff contends that the ALJ's decision is unsupported by substantial evidence and seeks a remand.

The Commissioner argues that the ALJ adequately accounted for plaintiff's mental health impairments with limitations addressed to the type of work and tasks to be performed, the nature of decision-making required, the frequency of changes at work, and the degree of interaction with others. Mem. in Supp. of Def.'s Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Mem."), ECF No. 19, at 1–2. The Commissioner contends that, in crafting such limitations, the ALJ accepted that plaintiff's mental health conditions restricted her capacities, but rejected her "extreme complaints" and claimed inability to work. *Id.* at 1, 14–15. Accordingly, the Commissioner argues that substantial evidence supports the ALJ's "holistic" RFC assessment and the explanation attendant thereto, and the Court should reject plaintiff's reflexive claim of error based solely upon the presence of moderate limitations in concentration, persistence, and pace. *Id.* at 2, 11, 15–17. Having considered the parties' contentions, the Court finds that the ALJ failed to comply with the requirements of *Mascio* and ensuing cases for the reasons set forth below.

As part of the five-step sequential analysis, an ALJ must determine a claimant's residual functional capacity, or RFC. *See* 20 C.F.R. § 416.945. The RFC is "the individual's *maximum remaining ability to do sustained work activities in an ordinary work setting . . .* 8 hours a day, for 5 days a week." SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996). An ALJ must assess a claimant's work-related abilities on a function-by-function basis. *Id.* at *3 (assessing physical, mental, and other abilities to perform work requirements in light of limitations and impairments). After doing so, the ALJ may express the RFC in terms of both the exertional levels of work (sedentary, light, medium, heavy, and very heavy) and the nonexertional functions supported by the evidence. *Id.* In determining a claimant's RFC, the ALJ must consider all relevant medical and other evidence in the record.[12] 20 C.F.R. § 416.945(a)(3). The ALJ then uses the RFC to determine whether the claimant can perform her past relevant work (step four), and whether the claimant can adjust to any other work that exists in the national economy (step five). *Id.* § 416.945(a)(5).

Where, as here, an ALJ finds a claimant suffers from moderate deficits in concentration, persistence, and pace but remains able to work, the ALJ must account for those deficits in the RFC or explain why such deficits required no additional limitations and did not affect a claimant's ability to work. *Mascio*, 780 F.3d at 636–38. The ALJ's failure to do so led to a remand in *Mascio*. *Id.* In *Mascio*, the Fourth Circuit clarified the requirements of SSR 96-8p and ruled that an ALJ fails to account for a claimant's moderate limitations in concentration, persistence, or pace by merely limiting the RFC to simple or routine tasks, or unskilled work. *Id.* at 638. The court

---

[12] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 416.929(a), (c).

observed that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Id.* The court also emphasized the need for sufficient explanation and analysis, particularly when the record contains contradictory evidence, to facilitate judicial review. *Id.* at 636–37 (noting that "although the ALJ concluded that Mascio can perform certain functions, he said nothing about Mascio's ability to perform them for a full workday").

If an ALJ adequately explains why moderate deficits in concentrating, persisting, or keeping pace do not affect a claimant's ability to work or require additional limitations in a claimant's RFC, remand is unnecessary. *Id.* at 638. For example, in *Shinaberry v. Saul*, 952 F.3d 113, 120–21 (4th Cir. 2020), the court addressed a claimed *Mascio* error based on the ALJ's failure to account for limitations in concentration, persistence, or pace when formulating the RFC and in questioning the VE. In doing so, the court reiterated that *Mascio* "did not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." *Shinaberry*, 952 F.3d at 121. Instead, the pertinent inquiry is case-centric and reviews whether the ALJ adequately explained the absence of any such limitation in the claimant's RFC or the hypothetical. *Id.* (noting, for example, that "[h]ypothetical questions" posed to the VE may "otherwise implicitly account for [such] limitations" (citation and internal quotation marks omitted)).

Notably, the sole RFC limitation directed to Shinaberry's mental impairment was for jobs requiring performance of only simple, routine, and repetitive tasks. *Id.* at 120. Nevertheless, the court found that the ALJ's review and discussion of the pertinent evidence "sufficiently explained why the mental limitation to simple, routine, and repetitive tasks accounted for Shinaberry's

borderline intellectual disability and her moderate limitations in . . . concentration, persistence[,] or pace." *Id.* at 121–22.

Alternatively, an ALJ may also avoid a *Mascio* error by imposing other RFC limitations addressing a claimant's ability to sustain work on a daily and weekly basis. Such limitations may include, for example, express time and pace restrictions in the RFC. *See Courtney L. v. Saul*, No. 2:20cv174, ECF No. 21, at 17 (E.D. Va. May 5, 2021) (report and recommendation) (citing *Fowler v. Colvin*, No. 3:14cv855, 2015 WL 8488971, at *6 (E.D. Va. Oct. 13, 2015) (specifying an RFC that included a limitation for "work that required no more than two hours at a time without at least a brief break," as well as for simple, routine, and repetitive tasks, a low stress environment, and only occasional interaction with the public)).

An ALJ may also specify other restrictions in the RFC that are functionally equivalent to time and pace restrictions. *See Sizemore*, 878 F.3d at 80–81 (upholding an RFC finding for work to be performed at a "non-production" pace, in a low stress job, without public contact, and involving performance of simple one or two-step tasks); *Perry v. Berryhill*, 765 F. App'x 869, 872 n.1 (4th Cir. 2019) (noting "the ALJ in *Sizemore* provided additional context" and included "descriptors" such as "without any 'fast-paced work' or 'public contact' . . . . to explain the restriction intended"); *Hunter v. Berryhill*, No. 3:17cv112, 2018 WL 310138, at *13 (E.D. Va. Jan. 5, 2018) (upholding an RFC specifying work "not at production rate," along with limitations for simple and routine tasks, only occasional changes in routine work setting, and no public and only occasional supervisory interaction). *But see Thomas v. Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019) (finding, among other ALJ errors, that the limitation to work not requiring a "'production rate or demand pace'" was insufficient for judicial review, absent explanation of the meaning of such terms).

Here, at step three of his analysis, the ALJ reviewed plaintiff's mental functional capacities and found her to be moderately limited in concentrating, persisting, or maintaining pace. R. 19; *see* R. 18–19 (also examining her abilities to process information, interact with others, and adapt and manage herself). The ALJ then undertook the "more detailed" "mental [RFC] assessment used at steps 4 and 5." R. 20. Based on this review, the ALJ's RFC specified the following non-exertional, mental limitations and restrictions: (1) unskilled jobs that can be learned in less than 30 days; (2) low stress jobs involving only occasional, simple decision-making and occasional changes in work duties or setting; (3) occasional interaction with co-workers; and (4) rare or incidental contact with customers and the public. *Id.* In doing so, he committed several *Mascio*-type errors.

First, in analyzing the medical opinion evidence, the ALJ ignored critical, contrary medical evidence pertinent to assessing plaintiff's ability to concentrate, persist, and maintain pace. *See Mascio*, 780 F.3d at 636–37 (remanding and finding the ALJ's lack of analysis "especially troubling" due to unaddressed, conflicting record evidence on the claimant's RFC). Specifically, the ALJ neglected to analyze the psychological testing and opinions of Dr. Korkoris of Genesis Counseling Center, as well as the opinions of the consultative examiner, Dr. Bierenbaum. *See* R. 23–24. This failure contravened the regulation requiring the ALJ to evaluate the persuasiveness of such opinions, based primarily on their supportability and consistency with the record. *See* 20 C.F.R. § 416.920c(b)(1), (b)(2), (c)(1), (c)(2). Although the ALJ recited some of the test results and opinions of Dr. Korkoris and Dr. Bierenbaum elsewhere, *see* R. 18–19, 22–23, his analysis of the medical opinions ignored their findings, R. 23.

These omissions are significant because Dr. Korkoris' testing of plaintiff's executive functioning reported a 13th percentile ranking for working memory and a 4th percentile ranking

23

for processing speed. R. 278, 282. Further, Dr. Korkoris' ADHD testing revealed "clinical level concerns with inattention and . . . abilities to sustain attention." R. 278. Further, other testing responses indicated that plaintiff "experiences significant difficulties with concentration, has memory difficulties, and experiences a low frustration tolerance and impulsivity." *Id.* Based on her comprehensive assessment, Dr. Korkoris diagnosed ADHD, major depressive disorder, and generalized anxiety disorder. R. 278–79.

Although Dr. Bierenbaum's consultative examination was somewhat more favorable, he reached similar diagnoses and similarly assessed plaintiff's functional abilities as degraded. R. 483. Assessing plaintiff's prognosis as "fair," Dr. Bierenbaum concluded that: (1) plaintiff either "might" or "likely would be able to perform simple and repetitive tasks," with either support or supervision and direction; (2) her disorders and emotional problems might limit her ability to handle the demands of the work day; and (3) she "might have moderate difficulty successfully completing a normal work day or work week and interacting with co-workers and the public," due to mental health problems. R. 484. These conclusions also find some support in Dr. Beal's observations about plaintiff's recall difficulties, tearful and unfocused mental state, and his diagnosis of ADHD, as well as Dr. Franklin's mental health diagnoses, both of which the ALJ also failed to discuss in analyzing plaintiff's mental RFC. R. 487, 489, 684. As in *Mascio*, the ALJ had a duty to analyze such evidence in assessing plaintiff's ability to concentrate, persist, and maintain pace at work on a daily and weekly basis or to explain why it need not have been considered.[13] Neither occurred here.

---

[13] The detailed test results and medical opinions also undercut the Commissioner's argument that plaintiff misapprehends the significance of a finding of "moderate" limitations in concentration, persistence, and pace. Def.'s Mem. at 10–11. Although the Commissioner correctly notes that SSA updated its mental health regulations in January 2017 to specify that a "moderate" limitation reflects a "fair" ability to function in a particular area of mental functioning "independently,

24

Second, rather than doing so, the ALJ found the administrative medical findings of the state agency psychological consultants to be "generally persuasive" and "partially consistent" with plaintiff's mental health treatment records and examination findings.[14]  R. 23.  These consultants assessed plaintiff as:  (1) not significantly limited in maintaining attention and concentration for extended periods; (2) not significantly limited in working on a schedule, keeping regular attendance, and being punctual; (3) moderately limited in sustaining a work routine without special supervision; and (4) moderately limited in completing "a normal workday and workweek without interruptions from psychologically based symptoms and [performing] at a consistent pace without an unreasonable number and length of rest periods."  R. 117–18, 133–34.  Other than finding these opinions as "partially consistent" with the record, the ALJ nowhere attempted to reconcile them with those of Drs. Korkoris or Bierenbaum (or Drs. Beal and Franklin), with the ALJ's finding of moderate concentration, persistence, and pace problems, or to explain why such opinions support a conclusion that plaintiff can meet the mental demands of work.  *See* 20 C.F.R. § 416.913(a)(2)(i)(B).  The absence of such analysis precludes meaningful judicial review and leaves the Court to speculate about the rationale for the ALJ's decision.[15]  *See Mascio*, 780 F.3d

---

have understood and used those words . . . since we first introduced the rating scale in 1985" and "do not represent a departure from prior policy."  81 Fed. Reg. at 66147.  As the update itself also recognizes, the facts of a particular claimant's case are a critical factor, as "the spectrum of limitation that may constitute 'moderate' . . . ranges from . . . [those that may be close to 'marked' in severity to . . . [those] close to the 'mild' level."  *Id.* at 66146.

[14] To account for plaintiff's complaints and her unsettled presentation to Dr. Beal, however, the ALJ more narrowly assessed plaintiff's ability to adapt and manage herself."  R. 23; *Cf.* R. 118, 134.

[15] Although the Commissioner's brief attempts to fill the gaps by reciting some items that may support the ALJ's conclusion about plaintiff's ability to work, the ALJ's ruling does not address such items.  *Compare* Def.'s Mem. at 13–14 (reciting (1) plaintiff normal mental status examination on October 24, 2017, at Gordon Wellness, R. 710; (2) Dr. Franklin's treatment notes reporting effective management of plaintiff's depression with medication, *see, e.g.*, R. 627, 638,

at 636–37; *Patterson v. Commissioner*, 846 F.3d 656, 662–63 (4th Cir. 2017) (remanding due to ALJ's failure to document the required analysis, including the RFC assessment, and admonishing ALJs to "[s]how your work").

Third, the Court rejects the Commissioner's argument that the mental-health related limitations selected by the ALJ adequately account for and/or explain why plaintiff remained able to work. Def.'s Mem. at 11–16; *see Shinaberry*, 953 F.3d at 120–22. As noted in the ALJ's decision, the abilities implicated by concentrating, persisting, and maintaining pace include:

> initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

R. 19. After identifying these pertinent abilities, however, the ALJ adopted an RFC that mostly failed to address plaintiff's mental health limitations.[16] Contrary to *Mascio*'s teaching that an ability to *perform* simple tasks differs from a capacity to *engage* in them on a daily and weekly basis, the RFC contains no limitations related to plaintiff's abilities to work at an appropriate and consistent pace, to complete tasks in timely fashion, to maintain attention while regularly working,

---

647; and (3) minimal and conservative mental health treatment); *with* R. 19–24.

[16] Arguably, the RFC's limitation to unskilled, low stress jobs, without complex decision-making or regular changes in work routine, partly relates to plaintiff's abilities to undertake and understand tasks and change work activities without being disruptive to others. *See* R. 19. Also, the limitation to only occasional interaction with co-workers arguably relates to plaintiff's ability to work closely with others without interrupting or distracting them. *See id.* The RFC's limitations concerning co-worker, customer, and public interaction, apply to plaintiff's ability to interact with others and to manage herself, as noted by the ALJ. *Id.*

to sustain routine and regular attendance at work, and to do so without inordinate numbers of breaks on any given day.

Absent further explanation and as recently noted in *Courtney L. v. Saul*, limitations such as handling simple instructions; making simple work-related decisions; reducing interaction with others; pertaining to changes in work situations and routines; performing simple, routine, and repetitive work; are directed to matters other than questions of persistence and pace. No. 2:20cv174, ECF No. 21, at 22–23 (citing *Handy v. Comm'r, Soc. Sec. Admin.*, No. SAG-09-166, 2015 WL 9302972, at *3 (D. Md. Dec. 22, 2015)); *see Xavier S. v. Saul*, No. 1:19cv1195, 2020 WL 1015816, at *25 (E.D. Va. Mar. 2, 2020) (noting that limitations for reduced interactions, changes in work settings, and exercise of judgment and decision-making were not directed to pace or stress level); *Ollis v. Berryhill*, No. 2:17cv33, 2017 WL 7167171, at *12 (E.D. Va. Dec. 18, 2017) (concluding that, without a better explanation, limitation to simple and routine tasks and reduced interactions with others failed to satisfy *Mascio*), *report and recommendation adopted*, 2018 WL 627386 (E.D. Va. Jan. 30, 2018). Similarly, the restrictions selected by the ALJ here do not, as the Commissioner contends, constitute a "holistic" RFC assessment sufficiently addressing plaintiff's ability to work day in and day out.[17] Def.'s Mem. at 2, 15.

Nor is this a case where the ALJ explained why the plaintiff retained the ability to work, without need of limitations directed to concentration, persistence, and pace. *See, e.g.*, *Shinaberry*, 953 F.3d at 122 (affirming ALJ decision that provided a detailed discussion and explanation why

---

[17] For this reason, the analysis in *Gandee v. Saul*, No. 4:19cv74, 2020 WL 5792636, at *8 (E.D. Va. June 8, 2020), has no application here. In *Gandee*, the Court sustained the denial of benefits based upon the ALJ's formulation of an extensive RFC limiting the claimant to simple, routine, and one to two step tasks; with minimal, if any, reading, writing, and math; avoidance of fast-paced tasks, such as assembly line jobs with production quotas; only occasional, brief, and superficial interactions with the public and co-workers; and involving avoiding crowded conditions and dangerous machinery and working conditions. *Id.* at *9.

limitations imposed accounted for claimant's intellectual disability and problems with concentration, persistence, and pace). After noting that plaintiff's depression, anxiety, and ADHD significantly limited plaintiff's ability to work, R. 17, the ALJ's conclusory analysis noted: (1) plaintiff's RFC "reflects the degree of limitation . . . found in the 'paragraph B' mental function analysis," R. 20; (2) plaintiff's medical problems were "not so severe as to be completely disabling," *id.*; (3) plaintiff remains able to perform "light and unskilled work on a sustained and consistent basis despite the limitations arising as a result of her impairments," *id.*; (4) her statements about her symptoms "are inconsistent because they are not supported by or consistent with the overall objective medical evidence of record," R. 21; and (5) the RFC is "supported by the overall objective medical evidence of record," which "does not support a finding that the [plaintiff] is more severely limited that stated above." R. 23–24.

With one exception, these conclusions not only fail to address the contradictory evidence and opinions noted above, but also are untethered to analysis of supporting facts concerning plaintiff's mental health. The sole exception is the ALJ's discussion of how plaintiff's activities of daily living, including care for her daughter, housework, shopping, and driving comported with the RFC. R. 24. This isolated reference cannot fill the gaps left by the failure to analyze contradictory psychological testing and opinions noted above. Nor, standing alone, does the ability to engage in some tasks of daily living, with intervening, multiple naps, resolve the inquiry whether plaintiff remains able to sustain work. R. 22, 486; *see Ollis*, 2017 WL 7167171 at *16 (finding that the performing of tasks such as driving, feeding a pet, watching TV, and doing occasional housework, was not dispositive of whether claimant could sustain work). Accordingly, the ALJ's

decision lacks an adequate explanation why, in the absence of RFC limitations directed to concentration, persistence, and pace, plaintiff is able to work.[18]

For the reasons described above, the ALJ's RFC was not supported by substantial evidence and this matter should be remanded for reconsideration.

## VI.    **RECOMMENDATION**

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment (ECF No. 16) be **GRANTED**, the Commissioner's motion for summary judgment (ECF No. 18) be **DENIED**, and the case be **REMANDED** to the Commissioner for further proceedings.

## VII.    **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

---

[18] For this reason, the ruling in *Matthew P. v. Saul*, No. 1:19cv01191, 2020 WL 7391297 (E.D. Va. Nov. 23, 2020), is distinguishable. Unlike here, the ALJ's decision in *Matthew P.* contained an extensive explanation about why plaintiff's mental health limitations did not affect his ability to work. *Id.* at *7–8.

29

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).


_____
                    Robert J. Krask
                    UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
May 25, 2021

30